UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LORI L. SARRAZINE, | ) |
| Plaintiff, | ) |
| v. | ) 1:11-cv-285 |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Lori Sarrazine appeals the Social Security Administration's decision to deny her application for disability insurance benefits. An administrative law judge found that Sarrazine was not disabled within the meaning of the Social Security Act. There is a disagreement between Sarrazine's treating physician and the consulting physicians over Sarrazine's ability to work, and that dispute forms the core of her appeal. I conclude that the ALJ reasonably rejected the opinion of Sarrazine's treating physician because substantial evidence in the record contradicted it. The decision of the ALJ will therefore be affirmed.

## BACKGROUND

The record in this case derives from three sources: Sarrazine's medical records; the testimony at the administrative hearing; and the ALJ's opinion.

**1. Medical Records**

Sarrazine's alleged disability began in June 2004 after she was in a car accident, which resulted in a little bit of lower back pain, some neck pain and some headaches. [Tr. 213.] An x-ray showed a congenital fusion of her C1 and C2 vertebrae, with no fracture or misalignment, and doctors diagnosed her with a lumber and cervical spinal strain. [Tr. 214-15.] Over the next

several months, Sarrazine reported headaches and some neck and shoulder pain. [*See, e.g.,* Tr. 225, 294, 300.] A TENS unit – a portable unit that sends electrical signals to an effected area – helped improve her pain symptoms. [Tr. 221-22, 432, 435.]

In May 2005, Sarrazine underwent a C4-C5 diskectomy and fusion, after which she reported that she was well and her neck pain improved. [Tr. 415-418.] A post-operative x-ray of Sarrazine's spine showed no complications. [Tr. 414.] Three months after her surgery, Sarrazine continued to report that she was doing well: she experienced some paresthesias (which is a tingling sensation) when using her hands, but stated that her neck pain had improved. [Tr. 412.] In September 2005, Sarrazine still reported some paresthesias but again noted improvement in her neck pain and headaches. [Tr. 401.] An EMG study was normal, and testing showed no evidence of any other neurological problem. [Tr. 401, 406.] In November 2005 and February 2006, Sarrazine reported that medication helped her paresthesias, her neck pain had improved, and her headaches were manageable. [Tr. 394, 397.]

The medical records indicate that her progress started to waver in the summer of 2006. In July 2006, Sarrazine reported that while her symptoms had improved overall since the surgery, they had worsened since her last visit. [Tr. 385.] In August 2006, Sarrazine reported numbness in her arms and headaches 2 to 3 times a week. [Tr. 379.] In early September, October, and November 2006, Sarrazine complained of right arm numbness, pain and headaches. [Tr. 350-51, 358, 372.] In May 2007, she reported no significant improvement. [Tr. 342.] In September 2007, Sarrazine reported that her headaches had decreased to 2 to 3 a week. [Tr. 339.] She had strained her neck while doing yard work, but prior to that, her pain had been better. [Tr. 339.] In November 2007, Sarrazine reported her headaches were daily and her neck pain chronic. [Tr. 327, 333.] In February 2008 and April 2008, Sarrazine complained of neck

2

pain radiating into her head, along with intermittent numbness and tingling in her extremities. [Tr. 317-19.]

Despite Sarrazine's subjective complaints, Sarrazine's doctors frequently noted that the objective findings were normal and showed no basis for her symptoms. In particular, her doctors recorded that her cervical MRI showed no evidence of nerve root or spinal cord compression; an MRI of her brachial plexus was unremarkable; and, that an EMG study was normal. [*See, e.g.*, Tr. 358, 368, 371, 372, 375, 498- 99, 546, 569, 592, 596, 602.] A neuro-surgical evaluation of Sarrazine's neck and arm pain and numbness found no structural evidence that correlated with her symptoms. [Tr. 639.]

Moreover, several times Sarrazine's physicians noted a potential for malingering, which is "feigning illness for secondary gain." *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 656 (7th Cir. 2012). For example, in January 2005, Sarrazine's physician noted that she "gave way" on examination. [Tr. 443.] In October 2006, Sarrazine's physician again recorded that she "gave way" on a strength examination. [Tr. 358.] In February 2007, her physician again noted that Sarrazine exhibited giveaway weakness on examination. [Tr. 319-20.] "Give-away" weakness is a form of malingering. *See Macy v. Astrue*, 2012 WL 124551, at *9, n. 10 (E.D. Mo. 2012) ("'Malingering and other functional weakness is often characterized by give-way weakness, in which normal strength of effort suddenly gives way.' *Merck Manual of Diagnosis and Therapy* 1602 (19th ed. 2011).").

Sarrazine saw consultative examiner Dr. Gorman in August 2008. [Tr. 523-26.] Dr. Gorman observed that Sarrazine's spine was non-tender, with the exception of slight tenderness in her cervical spine, and that her range of motion was decreased. [Tr. 525.] The next month Dr. Hasanadka, a state agency medical consultant, evaluated Sarrazine's physical functional capacity

3

and found that she could perform a range of light work. [Tr. 528-34.] Dr. Hasanadka concluded that Sarrazine could sit, stand or walk for 6 hours in an 8-hour work day, occasionally lift up to 20 pounds and frequently lift up to 10, occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl but could never climb ladders, ropes or scaffolds. [Tr. 529.] These findings were affirmed in December 2008 by Dr. Dobson, another state agency medical consultant. [Tr. 561.]

Sarrazine's treating physician, Dr. Lieb, arrived at different conclusions than Drs. Gorman and Dobson, however. Dr. Lieb opined in March 2009 that Sarrazine had several extreme restrictions due to chronic headaches, neck pain, and arm numbness and weakness. [Tr. 563-66.] She could walk no more than 1-2 blocks and sit, stand, or walk for less than two hours total in an 8-hour day. [Tr. 564.] Dr. Lieb asserted that Sarrazine could occasionally lift and carry up to, but never more than, 10 pounds and could no more than rarely look up or down, turn her head left or right, or hold her head in a static position. [Tr. 565.] The doctor also stated that Sarrazine was likely to miss more than 4 days per month due to her impairments. [Tr. 566.]

### 2. Testimony at the Hearing

Sarrazine testified at a hearing that she was 39 years old at the time, and that she last worked in June 2004 as a bank teller and she stopped working there because she was terminated. [Tr. 35, 37-38.] It was later that same month that she was in the aforementioned car accident.

Sarrazine testified that she continued to experience severe headaches and numbness in her extremities. She had headaches 4-to-5 times a week that lasted from 2-to-3 hours to a full day. [Tr. 40.] She also experienced constant neck and shoulder pain, her hands would sometimes go numb, and she sometimes felt a stabbing pain up into her arms. [Tr. 40-41.] Sarrazine testified that she could stand or sit for 30 minutes. [Tr. 42-43.]

Also appearing and testifying was Sharon D. Ringenberg, an impartial Vocational Expert ("VE"). After being presented with various hypotheticals, the VE testified that, while jobs would be available under some circumstances, competitive employment would be eliminated for persons unable to sit/stand/walk in combination for anymore than four hours a day and who would consistently miss two or more days a month. [Tr. 47-52.]

**3.   Summary of the ALJ's Decision**

In making her disability determination, the ALJ followed the familiar five-step sequential inquiry prescribed by the SSA's regulation: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step one, the ALJ found that Sarrazine had not engaged in substantial gainful activity since June 27, 2004, the alleged onset date. [Tr. 19.] At step two, the ALJ found that Sarrazine had the following severe impairments: degenerative disc disease (cervical), status post fusion (cervical); and headaches. [Tr. 19.]

At step three, the ALJ found Sarrazine did not have an impairment or combination of impairments that the Commissioner considers conclusively disabling. [Tr. 20.] The ALJ determined that Sarrazine had the residual functional capacity (RFC) to perform light work with the following qualifications: she could lift/carry or push pull no more than 20 pounds occasionally and 10 pounds frequently; she could sit up to 6 hours out of an 8-hour workday; she could stand/walk up to 6 hours out of an 8-hour workday; she could occasionally climb stairs and

ramps; she could occasionally balance, stoop, crouch, crawl, and kneel; she could never climb ladders, ropes or scaffolds; she could occasionally reach overhead with her upper extremities; and she could frequently perform fine fingering activities with both hands. [Tr. 21.]

At step four, the ALJ found that Sarrazine was unable to perform her past relevant work as a teller, financial customer service representative, housekeeper or cashier. [Tr. 23.] At step five, the ALJ found that, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant could perform and that thus Sarrazine was not disabled. [Tr. 24.]

## DISCUSSION

Unless there is an error of law, the Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence in the record. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Even if reasonable minds could differ as to the appropriate conclusion, as long as the ALJ's decision is supported by substantial evidence, it should be upheld. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). In evaluating the decision, the Court's "role is extremely limited." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. In fact, even if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported.") (internal quotation marks and citations omitted).

An applicant for disability benefits must establish the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing any kind of gainful employment that exists in the national economy, considering her age, education, and work experience. *Id*. § 423(d)(2)(A).

Sarrazine contends that the ALJ erred in a single way: at Step Four, in determining Sarrazine's RFC, she credited the opinion of agency physicians over the opinion of a treating physician. Sarrazine argues that the opinion of a treating physician must be given "special consideration." [DE 22 at 7.] This is true, to an extent. An ALJ must give "controlling weight" to a treating physician's "opinion on an issue of the nature and severity of an individual's impairment." SSR 96–8p. However, this "controlling weight" *only* applies if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Id.* Moreover, "if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it," *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008), so long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). *See also Filus v. Astrue*, 2012 WL 3990651, at *5 (7th Cir. 2012) ("[W]e require only that the ALJ minimally articulate his reasoning.").

The ALJ here was justified in discounting the treating physician's opinion because it suffered from at least one of the defects highlighted by the Seventh Circuit: it was "inconsistent with the consulting physician's opinion." *Ketelboeter*, 550 F.3d at 625. An ALJ is entitled "to rely on the opinion of physicians and psychologists who are also experts in social security disability evaluation." *See Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). And, "[w]hen

7

treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Dixon*, 270 F.3d at 1178. Therefore, if a treating physician's opinion is not "well-supported by medical evidence," the ALJ may reject it. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Of course, the ALJ must still at least "minimally articulate" why she decided "to believe" the consulting physician rather than the treating physician. The ALJ did that here. As she explained: "Although a treating physician has completed a physical residual functional capacity questionnaire, it is given no significant weight. The doctor has placed much stress on the claimant's reports of headaches and arm numbness or weakness. But as seen above, these impairments do not limit the claimant to the extent claimed." [Tr. 23.] The statement "as seen above" is a reference to the ALJ's earlier detailed analysis of the medical records in which she concluded that the evidence demonstrated that Sarrazine was inconsistent, unreliable, and overall did "not support the existence of impairments which would cause such extreme effects" as her alleged headaches and arm numbness and weakness. [Tr. 22-23.] Based on this detailed analysis, the ALJ concluded that Dr. Leib's findings to the contrary were unsupported by and inconsistent with the objective findings of the record. This was a reasonable conclusion to reach, particularly given that the ALJ also found that the state consulting physicians opinions were consistent with the objective record and thus entitled to "great weight." [Tr. 23.] This is not a case where, as Sarrazine argues, "[t]he ALJ is playing doctor by determining that Dr. Lieb's opinion is based on too much stress on headaches and arm numbness." [DE 22 at 8.]

In short, the ALJ more than "minimally" articulated her reasons for discounting the treating physician's opinion. As the Commissioner aptly summarized in his response brief:

> Dr. Lieb's opinion as to Sarrazine's limitations was based largely on self-reported

8

symptoms for which there was virtually no supporting objective evidence. Indeed, much of the medical record contradicted Sarrazine's allegations. Thus, the ALJ reasonably found, and identified several good reasons for finding, that Dr. Lieb's opinion was not entitled to controlling or significant weight.

[DE 26 at 9.] This is convincing, especially when one considers it in conjunction with the substantial evidence in the medical records of Sarrazine's malingering. The ALJ's conclusion "to believe" the consulting physicians rather than the treating physicians was supported by "substantial evidence." *Dixon*, 270 F.3d at 1178; *see also Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so). Since substantial evidence supports the ALJ's conclusions, this case does not warrant a remand.

## CONCLUSION

The ALJ provided legitimate reasons for her opinion. While reasonable minds could differ, the only issue is whether the conclusion reached by the ALJ was supported by substantial evidence, and it was. Accordingly, the decision of the ALJ is **AFFIRMED**.

**SO ORDERED**.

ENTERED: September 25, 2012.    s/ Philip P. Simon
                                PHILIP P. SIMON, CHIEF JUDGE
                                UNITED STATES DISTRICT COURT